UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARGIN J. HUGHES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:15-cv-01552-LJM-MPB |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Margie J. Hughes requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security Administration (the "Commissioner"), who denied Hughes' application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3).

Hughes contends that the ALJ improperly evaluated Hughes' credibility regarding her symptoms and therefore failed to provide an express credibility determination.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

On August 7, 2012, Hughes protectively filed for SSI, claiming that her disability dated back to January 13, 2011. R. at 144-49. Her application was denied both initially and upon reconsideration. R. at 74-77, 81-83. A hearing on Hughes' SSI application took place on April 21, 2014, at which Hughes appeared, with counsel, and testified. R. at 38-71.

1

On May 9, 2014, the ALJ found that Hughes was not disabled. R. at 19-37. Hughes filed a Request for Review of Hearing Decision, which was denied by the Appeals Council, making the determination of the ALJ the final decision of the Commissioner. R. at 1-16; see 20 C.F.R. §416.1481.

### B.  AGE, EDUCATION, WORK HISTORY & HUGHES' PERCEPTION OF HER IMPAIRMENTS

Hughes was born on January 10, 1963, and was 49 years old at the time of her alleged onset date. R. at 144. She has an eighth grade education. R. at 164. She has previous work experience as a server in a restaurant. R. at 45-46.

Hughes testified at the hearing that she lives with her brother and mother. R. at 43. She quit driving in 1998 due to seizures, and her daughter drives her when necessary. R. at 44.

Hughes stated at the time of the hearing that she was receiving treatment by a doctor for her lung, her breathing issues, her bipolar disorder (for which she receives counseling), and manic depression. R. at 46-47. Hughes also stated that she is being treated for both fibromyalgia and lupus. R. at 55. She further testified that she just started seeing a psychologist a month prior to the hearing. R. at 47. Hughes also indicated that she would begin psychiatric counseling, but had yet to do so. Id. Hughes stated that she has crying spells several times a day that last around fifteen to twenty minutes at a time. R. at 47-48. She also claimed that she heard voices daily, but that the voices did not tell her to hurt herself or others. R. at 48. Hughes further testified that she never had thoughts of harming herself or other people. Id.

Hughes stated that her family involuntarily hospitalized her for psychiatric treatment approximately one year before the hearing. R. at 49. Her family believed that

that she was not in touch with reality. *Id.* She was in the hospital for about a week. *Id.* Hughes testified that she was currently taking Vyvance and Prozac, neither of which cause her any side effects. R. at 50.

When questioned about her physical capabilities, Hughes stated that she could stand for less than an hour and could only walk two to three blocks at a time. R. at 50-51. She also testified that she could sit for about thirty to forty minutes before needing to stand up or lie down. R. at 51. She claimed to only be able to lift ten pounds, but could pick up small objects such as coins with her fingers. *Id.* Hughes could also hold onto a cup or glass without dropping it. *Id.*

Hughes indicated that she is capable of grooming herself as well as performing routine household chores, such as laundry, washing the dishes, and cooking. R. at 52. She also stated that she occupies her time by watching TV, reading, as well as enjoying arts and crafts. R. at 53-54. Hughes testified that she shops for groceries about once a month and uses a push cart when doing so. R. at 52-53.

Hughes stated that she was not in any pain at the hearing. R. at 54. She also answered that she does not currently drink and smokes only an occasional cigarette. *Id.* Hughes smoked a pack a day for twenty years, but quit approximately five years before the hearing. *Id.* Hughes stated that she has never used illegal drugs or abused prescription medicine. R. at 55.

When questioned about the reasons she is unable to work, Hughes answered, "Just what physical limitations that I have and some mental. Just no good at remembering things, scheduled. … All I've ever worked is part-time, and that was hard to keep up with." *Id.*

### C. MEDICAL EXPERT TESTIMONY

#### 1. Dr. Robert Sklaroff

Dr. Robert Sklaroff reviewed the medical evidence of record and listened to Hughes' testimony at the hearing. R. at 56-57. Dr. Sklaroff first examined whether Hughes exhibited evidences of a diagnosis for fibromyalgia. R. at 57. He noted that Hughes complained of pain in her spine, ribs, pelvis, lower back, and left lower extremity knee joint. R. at 57. Nonetheless, he found that "when the issue is out there regarding trigger points to assess where the point of discomfort may be located" the medical records "come up dry." *Id.*

Dr. Sklaroff also considered the fact that Hughes was referred to a rheumatologist and that she had been a smoker. *Id.* He stated that her leg edema is something that could be handled with tight stockings, if necessary. R. at 57-58.

Dr. Sklaroff noted that Hughes had increased Vitamin D, but maintained normal levels of liver enzymes. R. at 58. He again noted that there was no trigger points evaluation in her muscular skeletal exhibit. *Id.* Dr. Sklaroff stated that he did "not find[] anything specifically gripping." *Id.* In reviewing Hughes' medical records, Dr. Sklaroff stated, "It does not seem that these are documented problems lasting a year and causing any kind of disability." R. at 59.

Dr. Sklaroff testified about one of Hughes' medical evaluations that "gave her, for reasons I don't understand, 20 pounds occasionally, 10 pounds frequently[.]" R. at 60. He noted that her gait and pace were normal as well as her receptors, except zero in elbow, knee, and ankle. *Id.* With respect to the latter fact, he stated, "But again she's walking and talking. So I'm not sure that carries weight specifically as to why." *Id.* Dr.

Sklaroff mentioned sporadic seizures and a slightly limited range of motion in terms of her back. R. at 61. He noted "[n]o significant limits." *Id.*

Dr. Sklaroff stated that Hughes has sinusitis, but it only occurred on occasion. *Id.* He then testified, "The fact that she has a decreased range of motion, it's now allow [sic] for an individual and the arthritis is going to be highly symptomatic and can approach meeting 1.04(a) for listing. Otherwise, everything is clean." *Id.*

Dr. Sklaroff concluded that Hughes, both individually and in the aggregate, "should be able to stand/walk up to eight hours, six hours a day during a normal eight-hour day with normal breaks." R. at 61-62. He also believed that she could lift twenty pounds and could lift ten pounds frequently if not more. *Id.* Dr. Sklaroff opined that Hughes should have no problems reaching, pulling, or squatting. R. at 62. He also found that she would have "no problems with using her hands and the environment." *Id.* The only problem that he potentially foresaw related to a potential bronchitis encounter due to her past history as a smoker, which could be resolved by avoiding exposure to chemicals. *Id.* Otherwise, he concluded that Hughes needed no other environmental limits except that she should avoid for climbing ropes, scaffolds, ladders, heights, and similar activities. *Id.*

Upon questioning by Hughes' counsel, Dr. Sklaroff stated that Hughes would not have continuing problems with edema since she could wear tight stockings. R. at 62-63.

### 2. Dr. Don Olive

Dr. Don Olive testified about Hughes' mental health, after reviewing Hughes' medical records and listening to her testimony. R. at 64. With regard to functional limitations, Dr. Olive stated that he "would limit her to unskilled work or simple repetitive tasks[,]" and that Hughes should probably "have no more than occasional contact with

5

the public and with peers." R. at 65. He also stated that she would need a job that was regular in expectations, but she would not be able to do fast-paced work. *Id.* Finally, he stated that Hughes would be fully capable of handling both verbal and written instructions. *Id.*

### D. RELEVEANT ASPECTS OF THE ALJ'S DECISION[1]

The ALJ, noting that he first considered the entire record, found that Hughes has a Residual Functioning Capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), although he did find that she was unable to climb ladders, ropes, or scaffolds and must avoid hazards. R. at 28. He also found that she must be limited to the performance of simple repetitive tasks that do not involve more than occasional interaction with the public or coworkers. *Id.* Finally, he concluded that Hughes requires a work setting with regular expectations and that she is unable to work a job that involves fast-paced production requirements. *Id.*

In so finding, the ALJ reviewed Hughes' hearing testimony and medical evidence. He noted that at the time of filing, Hughes alleged that she had not been able to work since January 13, 2011, due to seizures, bipolar manic/depressive disorder, lupus, fibromyalgia, osteoarthritis, rheumatoid arthritis, gout, deterioration of the spine, some form of spinal bifida, memory loss, migraines, post-traumatic stress disorder, and attention deficit disorder. R. at 29.

The ALJ also noted Hughes' hearing testimony wherein she "alleged that the conditions that limit her ability to work are the bipolar or manic-depressive disorder and

---

[1] Hughes' sole claim is that the ALJ improperly considered her credibility in determining her RFC. Accordingly, the Court will limit its review to that portion of the ALJ's decision. *See* R. at 28-31.

her breathing problems." *Id.* He mentioned that Hughes suffers from crying spells as well as hearing voices, but noted that the thoughts and voices do not command her to do harm to herself or others. *Id.*

The ALJ then reviewed Hughes' hearing testimony, in which she stated that she is unable to stand for one hour at a time, cannot walk more than a couple of blocks, and could only sit for thirty to forty minutes. *Id.* He noted that Hughes also testified that she could lift and carry up to ten pounds, as well as pick up small objects and grasp larger objects without dropping them. *Id.* The ALJ considered Hughes' ability to groom and dress herself, in addition to her ability to complete household chores and cook meals. *Id.*

The ALJ next examined the hearing testimony of Dr. Sklaroff, who suggested that Hughes "has diffuse muscle pain suggestive of fibromyalgia and that she has a history of systemic lupus erythematous." *Id.* The ALJ noted, however, that Dr. Sklaroff stated the objective findings do not corroborate the requisite trigger points to establish fibromyalgia or the necessary clinical findings to confirm systemic lupus erythematous. *Id.* The ALJ also considered Dr. Sklaroff's comment that Hughes' peripheral edema could be controlled with a compression hose. *Id.* The ALJ further reviewed Dr. Sklaroff's testimony with respect to her October 29, 2012, examination, noting that Hughes' posture and gait were normal and, except for a very modest limitation in her neck, hips, and knees, she had full range of motion. *Id.* Finally, the ALJ considered Dr. Sklaroff's recommendations as to Hughes' physical limitations. *Id.*; *see supra*, pt. I, C, 1.

The ALJ next evaluated Dr. Olive's psychological assessment of Hughes, noting that the doctor found Hughes to exhibit signs and symptoms of a bipolar, post-traumatic stress disorder and had a history of opioid dependence. R. at 30. The ALJ found that

the substance abuse history was not a substantial factor with respect to her mental limitations. *Id.* The ALJ then noted Dr. Olive's recommendation as to Hughes' mental limitations. *Id.*; *see supra*, pt. I, C, 2.

Following these considerations, the ALJ determined that Hughes' personal assessment concerning her symptoms were not entirely credible. *Id.* He stated: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible for the reasons explained in this decision." *Id.*

The ALJ then reviewed Hughes' allegation that she had breathing problems, noting that the pulmonary function studies obtained in January 2013 were interpreted to show only mild obstructive pulmonary disease with Forced Expiratory Volume for one second and Forced Vital Capacity in excess of eighty percent of the predicted normal. *Id.* And while Hughes has a lung mass, the ALJ remarked that the radiological studies "have been interpreted to indicate that this is merely a stable right middle lobe granuloma and not a suspicious pulmonary nodule or mass." *Id.* The ALJ considered a note dated March 24, 2014, wherein Hughes' physician indicated normal, symmetric expansion of her chest wall with a normal respiratory rate and pattern. *Id.* The physician observed no respiratory stress and remarked that Hughes had normal breathing sounds. *Id.* The ALJ also considered Hughes' complaints of back and joint pain, but found that the reports from the consultative examiner and treating sources indicated normal strength, essentially normal range of motion, normal gait, and normal ability to use both hands and arms. *Id.*

The ALJ further found that, apart from a brief psychotic episode in April 2013, Hughes' mental status had been stable. *Id.* He noted that Hughes' primary care physician recently stated that that Hughes was doing well without any significant affective symptoms. *Id.*

The ALJ then examined the opinion evidence, remarking that the internal medicine specialist who examined Hughes in October 2012, opined that she had rather significant limitations (e.g. sitting limited to one or two hours, standing limited to thirty to forty-five minutes, walking limited to four blocks, and lifting/carrying limited to ten pounds.) *Id.* The ALJ stated that this assessment was inconsistent with those from other medical sources, finding "that such limitations are not supported by objective clinical findings." *Id.* He observed that the physician set forth these limitations, despite opining that Hughes had normal posture and gait, as well as full range of motion. *Id.* The ALJ found the assessment was not credible and assigned it "very little evidentiary weight." *Id.*

The ALJ next found that the assessment of the State medical consultants – who opined that Hughes had adequate functional capacity to perform light work that did not involve climbing ropes, ladders, scaffolds, or crawling or concentrated exposure to hazards – was to be given some evidentiary weight. R. at 31. Dr. Sklaroff's assessment, on the other hand, was given great evidentiary weight and the ALJ adopted it for Hughes' physical RFC. *Id.* The ALJ stated that Dr. Sklaroff offered cogent reasons for his assessment and had the opportunity to review all of Hughes' pertinent medical records. *Id.*

The ALJ also concluded that Dr. Olive's assessment of Hughes's mental functional capacity was credible and adopted it for her mental RFC. *Id.* In support, the ALJ noted,

9

that Dr. Olive reviewed all of the pertinent evidence concerning Hughes' mental functional capacity in making his evaluation.

## II. **STANDARD**

To be eligible for Disability Income Benefits ("DIB") or SSI,[2] a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

I. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

V. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1505 *et seq.* The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.* For convenience, only the DIB regulations are set forth herein.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step.  *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner.  *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  *See also*, *Craft*, 539 F.3d at 673.  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning."  *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).  *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ

"must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))). An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Craft*, 539 F.3d at 673.

### III. ANALYSIS

Hughes' sole contention is that the ALJ improperly evaluated the credibility of her symptom testimony. Dkt. 22 at 7-9. Hughes takes exception with the ALJ's credibility determination, in which the ALJ states: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible for the reasons explained in this decision." R. at 30. Hughes argues that this language is merely a "template" that has been criticized by the Seventh Circuit in *Bjornson v. Astrue* 671 F.3d 640, 645-46 (7th Cir. 2012). She claims that by adopting this language, the ALJ essentially determined Hughes' RFC/ability to work first and then used the RFC to discount her credibility. In other words, Hughes alleges that the ALJ put the proverbial cart before the horse and failed to assess her credibility with respect to the "intensity, persistence and limiting effects" of her symptoms before determining her ability to work.

*Bjornson* found that the use of the "template" language to make a finding that a claimant is not credible – with nothing more – "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that the claimant's complaints were not credible." 671 F.3d at 645 (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)). Indeed, the ALJ in *Bjornson* improperly decided a

claimant's ability to work and then applied that analysis to determine the claimant's credibility. *Bjornson*, 671 F.3d at 644. The *Bjornson* court noted that the "applicant's credibility thus cannot be ignored in determining her ability to work (her residual functional capacity, in SSA-speak)." *Id.* at 646. That is not the case here.

Although the Seventh Circuit has stated that, without more, use of the language similar to that utilized by the ALJ may be considered inadequate, it has upheld credibility findings that employ such language to an analysis of the record. *See, e.g., Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Castille v. Astrue*, 617 F.3d 923, 929-30 (7th Cir. 2010). In *Filus*, the court recognized that following the boilerplate language forces the claimant's testimony into a "foregone conclusion," i.e. what the ALJ considers as the RFC, rather than properly considering the testimony to make the RFC determination. 694 F.3d at 868. Nonetheless, the *Filus* court recognized that if "the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless. Here, the ALJ did offer reasons grounded in the evidence, and so we can proceed to examine them." *Id.* The same holds true in the instant case.

The ALJ offered numerous reasons for his credibility determination. Before making his credibility finding, the ALJ first noted his responsibility to make such a finding when a claimant's statements about the intensity, persistence, or functionally limiting effects of pain are not substantiated by objective medical evidence. R. at 28-29. He noted that Hughes stated at the hearing that the conditions that limit her ability to work were her bi-polar or manic-depressive disorder in addition to breathing problems. The ALJ also went on to review Hughes' testimony, as well as that of Dr. Sklaroff and Dr. Olive. R. at 29-30.

The ALJ then concluded that Hughes' testimony was not credible. R. at 30. In doing so, the ALJ compared Hughes' testimony with her medical records. *Id.* He noted that her alleged breathing problems were not supported by recent medical evidence. *Id.* The ALJ cited a "note dated March 24, 2014, the claimant's primary care physician indicated that the claimant exhibit normal, symmetric expansion of chest wall with a normal respiratory rate and pattern. The physician observed no respiratory distress." *Id.* The ALJ then discounted Hughes' complaints of back and joint pain, stating that the consultative examiner and treating sources indicated "that she had normal strength, essentially normal range of motion, normal gait and normal ability to use the hands and arms." *Id.* Finally, the ALJ noted that Hughes' mental status, despite her complaints of bipolar or manic-depressive disorder, has been stable. *Id.* He remarked that the "most recent notes from [Hughes'] primary care physician indicate that she is doing well without any significant affective symptoms." *Id.*

Hughes is unable to explain how *Bjornson* would be applicable to this case. Indeed, she merely cites *Bjornson* without any attempt to apply the facts in this case to the ALJ's decision. Dkt. 22 at 9. The Court finds that the ALJ adequately explained his decision for making the credibility determination and that his decision offered sufficient reasons based on the evidence of record. *See Filus*, 694 F.3d at 868.

## IV. **CONCLUSION**

For the reasons stated herein, the Court concludes that Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, did not err in her decision to deny Plaintiff Margie J. Hughes' application Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3).  Accordingly, this Court **AFFIRMS** the Commissioner's decision.  The Court will enter judgment accordingly.

IT IS SO ORDERED this 15th day of December, 2016

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Joseph W. Shull
jshull@joeshull.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov